IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EMSI, Inc. d/b/a Environmental Management, Inc.,<br>8220 Industrial Parkway<br>Plain City, Ohio 43064,<br><br>               Plaintiff,<br>v.<br><br>Joseph Lewis,<br>4460 Hunters Bend<br>Powell, Ohio 43065,<br><br>  and<br><br>Yard Solutions, Inc. d/b/a Yard Solutions,<br>4830 Hendron Rd.<br>Groveport, Ohio 43125,<br><br>               Defendants. | **JURY DEMAND ENDORSED HEREIN** |

## COMPLAINT

Plaintiff EMSI, Inc. d/b/a Environmental Management, Inc. ("EMI" or "Plaintiff"), by and through its undersigned counsel, files its Complaint against Defendant Joseph Lewis ("Mr. Lewis") and Yard Solutions, Inc. d/b/a Yard Solutions ("Yard Solutions" and, collectively with Mr. Lewis, "Defendants") and states as follows.

**Nature of the Action**

1. This is an action for damages and injunctive relief to address the wrongful and unlawful conduct of Defendants, including Defendants' disclosure, use, and misappropriation of Plaintiff's trade secrets and other confidential customer and business information for their own benefit and gain. As explained in greater detail below, Plaintiff recently discovered that Mr. Lewis, after his employment with EMI ended, retained a computer containing Plaintiff's trade secrets and

1

confidential information, that he has improperly accessed that computer, that he repeatedly inserted and accessed multiple USB drives on that computer after his employment with EMI ended, that he appears to have transferred trade secrets and confidential information from that computer using the USB devices, and that he used that information to unfairly compete for Plaintiff's customers and prospective customers and improperly recruit Plaintiff's employees.

### The Parties

2. Plaintiff EMSI, Inc. d/b/a Environmental Management, Inc. is an Ohio corporation with its principal place of business at 8220 Industrial Parkway, Plain City, Ohio 43064.

3. Upon information and belief, Defendant Joseph Lewis is a resident of Delaware County, Ohio, residing at 4460 Hunters Bend Powell Ohio 43065.

4. Upon information and belief, Defendant Yard Solutions, Inc. d/b/a Yard Solutions is an Ohio corporation with its principal place of business at 4830 Hendron Road, Groveport, Ohio 43215.

### Jurisdiction and Venue

5. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1331, as Plaintiff is asserting claims arising under the laws of the United States.

6. This Court can exercise personal jurisdiction over Defendants because the primary acts giving rise to the claim occurred in this District, Defendant Mr. Lewis resides in this District and Defendant Yard Solutions is located in this District.

### Mr. Lewis's Employment at EMI

7. Mr. Lewis worked for EMI starting on or about September 25, 2014 working in Maintenance Management.

8. During his time at EMI, Mr. Lewis also worked in sales and Employee Services with responsibilities related to training, payroll and benefits.

9. As a result of his work in multiple different roles, he had access to different types of confidential information at EMI that was necessary to fulfill each of his multiple different roles.

10. On or about April 14, 2022, Mr. Lewis was terminated from his employment. (Ex. 1, Severance Agreement.)

11. When Mr. Lewis was terminated, he signed a Severance Agreement that stated: "Employee agrees to return to Employer any and all company property and represents to Employer that Employee does not possess any confidential or proprietary information of the company, including but not limited to, customer lists, financial information and confidential methods of appraisal." (*Id.* at 2.)

12. After his termination, Mr. Lewis continued to work for a company owned by one of the principals of EMI known as Tusker Arms. Tusker Arms is involved in the sale of firearms and its business is unrelated to the business of EMI. In order to continue working for Tusker Arms, Mr. Lewis was permitted to use a laptop and EMI email address for Tusker Arms business.

13. Mr. Lewis' consultancy with Tusker Arms ended on November 26, 2022.

**EMI Has a Legitimate Business Interest.**

14. During Mr. Lewis' employment with EMI, EMI provided Mr. Lewis with access to valuable and confidential information and trade secrets, including customer lists, employee databases, customer preferences, prior service histories, terms of contracts and bids with customers and prospective customers, procedural manuals, and pricing information. EMI paid Mr. Lewis and provided him with the opportunity to develop, cultivate, and maintain relationships with Plaintiff's customers.

15. Plaintiff invests substantial time, effort, and expense cultivating a customer base, maintaining goodwill, and continuing relationships with those customers to market and promote Plaintiff's services.

**Plaintiff Protects the Secrecy of its Confidential Information,
Which Has Great Value to Competitors**

16. Plaintiff takes multiple steps to protect the confidentiality of its Confidential Information. Plaintiff requires employees to sign the Employee Handbook, which states, that employees must: "[m]aintain the confidentiality of EMSI's trade secrets and private or confidential information." (Ex. 2, EMI Employee Handbook, p. 17).

17. EMI's handbook also states the following regarding personnel files: "Personnel files are business records of the company and, thus, are company property. Personnel files are considered confidential by the company." (*Id.*)

18. During training, EMI tells employees that EMI has trade secrets and confidential information that are only to be used in conjunction with EMI business.

19. Plaintiff also limits access to its trade secrets and confidential information to those with a "need to know" and stores that information in a secure, password-protected system and on an encrypted network.

20. Plaintiff's trade secrets and Confidential information have great value to competitors because they provide competitive information regarding customers who generate significant revenues and who have demonstrated a need and desire for landscaping and snow removal services; provide information on the history of past business; and identify Plaintiff's proprietary business model and pricing/markup strategy.

21. If Plaintiff's competitors gained access to its trade secrets and confidential information, they would be able to direct their marketing efforts to a pre-selected group of Plaintiff's customers and offer discounted pricing or pay incentives that would undercut Plaintiff in the market, all without the need to spend time, money, or resources to develop the customers or other trade secrets and confidential information.

22. Plaintiff has a legitimate business interest in its customer relationships, employment relationships and business relationships.

23. Plaintiff's customer lists, customer history information, project management information and relationships are valuable and unique assets that have been acquired at considerable expense to Plaintiffs. (*See* Ex. 2 at 17, 21; Ex. 1 at 2.)

### Mr. Lewis Agreed to Protect the Confidentiality of Plaintiff's Confidential Information

24. EMI's Handbook states that employees must: "[m]aintain the confidentiality of EMSI's trade secrets and private or confidential information. Trades secrets may include information regarding the development of systems, processes, products, know-how and technology. Do not post internal reports, policies, procedures or other internal business-related confidential communications." (Ex. 2 at 21.)

25. EMI's handbook also states the following regarding personnel files: "Personnel files are business records of the company and, thus, are company property. Personnel files are considered confidential by the company. Employees may, at the sole discretion of the company, be permitted to review the personnel file, however, the company is not required to do so. Copying of any document from any personnel file is prohibited without the express written consent of the company. (*Id.* at 17).

26. On or about April 6, 2016, Mr. Lewis signed an acknowledgement of the EMI Employee Handbook. (Ex. 3.)

27. When Mr. Lewis was terminated, he signed a Severance Agreement in which he represented that he had returned all of EMI's trade secrets and confidential information. (Ex. 1 at 2.)

5

28. On or about April 14, 2022, Mr. Lewis signed a Severance Agreement that stated: "Employee agrees to return to Employer any and all company property and represents to Employer that Employee does not possess any confidential or proprietary information of the company, including but not limited to, customer lists, financial information and confidential methods of appraisal." (*Id.* at 2.)

29. After his termination, Mr. Lewis continued to work for a company owned by one of the principals of EMI known as Tusker Arms. Tusker Arms' business is unrelated to the business of EMI.

30. While Mr. Lewis served as a consultant for Tusker Arms until November 2022, that consultancy did not authorize, justify or permit Mr. Lewis to access information regarding EMI's business, customers or employees that might have remained on that EMI laptop. Instead, he was only authorized to access information of Tusker Arms.

31. After Mr. Lewis' consultancy with Tusker Arms ended on November 26, 2022, unbeknownst to EMI, Mr. Lewis retained his laptop.

32. Mr. Lewis had no authority to continue to access EMI information on EMI's laptop after April 2022, and he had no reason to retain the EMI laptop after November 2022, when his consultancy with Tusker Arms ended.

### Mr. Lewis' Employment with Yard Solutions

33. Starting in or around May 2022, Mr. Lewis started working at Yard Solutions, as Yard Solutions' Chief Operating Officer.

34. Yard Solutions is one of EMI's competitors.

### Mr. Lewis and Yard Solutions Are Using Plaintiff's Confidential Information to Unfairly Compete with Plaintiff

35. After Mr. Lewis left the company, Plaintiff determined it was missing a laptop (the "Laptop") as part of an audit of Plaintiff's computers.

36. Mr. Lewis initially denied he had the Laptop.

37. After conducting an investigation to find the Laptop when it was on and accessing the internet, EMI determined on May 24, 2023, that the Laptop was being used and was logged into Mr. Lewis' user profile.

38. EMI also determined that the Laptop was using and being accessed through Yard Solution's wireless network.

39. EMI again asked for the Laptop be returned.

40. Gary Clark, EMI's Vice President, spoke with his daughter, Andrea Lewis ("Ms. Lewis"), who is married to Mr. Lewis, regarding the missing Laptop.

41. On May 26, 2023, Ms. Lewis returned the Laptop to EMI and indicated that she had retrieved the Laptop from Mr. Lewis.

42. After the Laptop was returned, Mr. Lewis initially denied that he had accessed or used the Laptop.

43. When the Laptop was returned, EMI determined there were numerous file names that appeared to contain EMI's confidential or trade secret information.

44. To determine whether the Laptop had been used prior to the time it was returned to EMI, EMI hired a forensic consultant, Vestige Digital Investigations ("Vestige"), to conduct a forensic examination of the Laptop.

45. On July 5, 2023, EMI received a report from Vestige ("Vestige's Report") of the documents and information contained on the Laptop. A copy of Vestige's Report (without the exhibits to the Report that may contain confidential information) is attached as Exhibit 4.

46. Vestige's Report demonstrates that many EMI files containing trade secrets and confidential information were saved and available on the Laptop, including EMI's 2021 Customer List, EMI's 2020 Master Customer List, EMI's 2019 Master Customer List, The Charles at Riggins Run 2021 Full Service Renewal, Maintenance/Snow Removal price estimators, and employee records that include names, addresses, phone numbers, social security numbers, and health records.

47. Vestige's Report also confirmed that the Laptop was repeatedly accessed throughout 2023 after Mr. Lewis' employment with EMI ended, that it was accessed while connected to Yard Solutions' wireless network 62 times from January 2023 through May 2023, that at least two USB devices were inserted into the Laptop from January 2023 through May 2023, and that folders on the EMI laptop that included information of multiple EMI customers were also accessed during that time period.

48. This information demonstrates that Mr. Lewis (or someone else at Yard Solutions) was using the Laptop, but also these facts indicate that he or someone else at Yard Solutions was likely using information on the Laptop for Yard Solution's business.

49. EMI has been informed by a former employee of Yard Solutions that multiple of EMI's documents and information have been uploaded from the Laptop to Yard Solutions' servers and computers, that some of those documents still contain EMI's logo, and that these files are being used in conjunction with Yard Solutions' business.

50. In addition, Vestige found evidence of USB activity on the computer in 2022 and 2023, which suggests that files were being copied off the Laptop to be used on other devices. Without having access to the USB devices, Vestige can only ascertain the first and last date that a

8

USB device is inserted, so it is impossible to know what was done with the USB devices, what was copied on to the USB devices, and how many times the USB devices were inserted. Therefore, EMI will need to have access to those USB devices to fully understand what was done with the Laptop and which of EMI's files were copied to be used on other devices.

51. A 32 GB Memorex device was first used on February 17, 2023 and last used on May 23, 2023. A 64 GB unnamed USB device was utilized on April 18, 2023.

52. Files accessed in 2023 on the EMI laptop reference the following file names, which identify clients or potential clients of EMI that are now customers of Yard Solutions:

- Glenmuir
- Chestnut Hill
- Glenchester Lakes
- Powell Center
- Wexford Lakes

53. Some of these files were accessed contemporaneously with the use of a USB device. To determine whether these and other files were copied or moved to a USB device, Vestige will need to inspect and analyze the USB devices that were inserted since April 2022.

54. On July 7, 2023, EMI's counsel sent a letter to counsel for Mr. Lewis and Yard Solutions requesting that Mr. Lewis and Yard Solutions preserve and not delete anything from all USB devices that Mr. Lewis or someone else used with the Laptop since April 2022, including the 32 GB Memorex device first used on the laptop on February 17, 2023 and last used on May 23, 2023; and the 64 GB unnamed USB device utilized on April 18, 2023. (Ex. 5.)

55. Since that time, Vestige has also determined that an "EasyStore" USB device was used on the computer in 2022 on multiple occasions both during and after Mr. Lewis' employment at EMI ended.

9

56. On or about July 20, 2023, EMI's counsel sent an e-mail again requesting access to all USB devices no later than July 28, 2023, including external hard drives, that Mr. Lewis or anyone from Yard Solutions connected to the Laptop since January 1, 2022, including but not limited to: the 32 GB Memorex device first used on the Laptop on February 17, 2023 and last used on May 23, 2023: the 64 GB unnamed USB device utilized on April 18, 2023; and the EasyStore USB device used in June 2022. (Ex. 6.)

57. As of the date of filing of this Complaint, Mr. Lewis and Yard Solutions have not provided the USB devices that were used on the Laptop despite EMI's counsel requesting them on multiple occasions. It appears that Yard Solutions and Lewis will contend that some or all of this information on the USB devices is owned by them and therefore, that a dispute over that information is inevitable.

58. EMI will require this Court's assistance so that it can, at minimum, secure the USB devices, access the information on those devices, and enable Vestige to perform an inspection of those devices to determine the extent of any misappropriation of EMI's confidential information and trade secret information.

**EMI Has Lost Customers and Employees to Yard Solutions Since Mr. Lewis Went to Work for Yard Solutions**

59. Mr. Lewis continues to work at Yard Solutions as Yard Solutions' Chief Operating Officer.

60. Mr. Lewis had access to the Laptop before his wife returned Laptop, which contained EMI's trade secrets and confidential information.

61. Upon information and belief, Mr. Lewis has divulged trade secrets and confidential Information belonging to Plaintiff to others at Yard Solutions to enable them to unfairly compete for Plaintiff's customers and employees.

10

62. EMI has been informed by a former employee of Yard Solutions that multiple of EMI's documents and information have been uploaded to Yard Solutions' servers and computers from the Laptop, that some of those documents still contain EMI's logo, and that these files are being used in conjunction with Yard Solutions' business.

63. Upon information and belief, Defendants have further retained, used, and disclosed trade secrets and confidential information that constitutes trade secrets of Plaintiffs.

64. Upon information and belief, Yard Solutions knew before it hired Mr. Lewis that he worked for Plaintiff and that he had continuing confidentiality obligations to Plaintiff.

65. Since the time that Mr. Lewis started at Yard Solutions, the following employees have left EMI and gone to work for Yard Solutions:

- Stephan Zachary (Zach) Rohr, who was Director of Development at EMI and who worked at EMI from January 27, 2020 to January 27, 2023;
- Dillon Eppich, who was an Irrigation Installation Tech at EMI and worked at EMI from January 19, 2019 to November 23, 2022;
- Emmanuel Cruz, who was an Install Crew Leader at EMI and who worked at EMI from May 3, 2015 to January 10, 2023;
- Jennifer Jimenez-Salinas, who was an Employee Services Specialist at EMI and who worked at EMI from December 9, 2021 to January 20, 2023; and
- Jason Willson, who was a Mechanic at EMI and who worked at EMI from July 22, 2021 to April 28, 2023.

66. In addition, since the time that Mr. Lewis started at Yard Solutions, the following customers have left EMI and gone to Yard Solutions:

- Turkey Run, which had been a landscaping maintenance customer for four years;
- Powell Crossing, which had been a landscaping maintenance customer for two years;
- Charles at Riggins Run, which had been a landscaping maintenance and snow removal customer for two years; and
- Troy Farms, which had been a landscaping maintenance and snow removal customer for two years.

67. Total, these customers listed above were charged over $200,000 in 2022 before leaving EMI.

11

68. In addition, EMI has quoted the following potential customers for work and they, instead, are receiving services from Yard Solutions:

- Stafford House
- Alexander Park
- Copley Park
- Chestnut Hill
- Ridge at Chestnut Hill
- Wexford Lakes
- Glenchester Lakes
- Dublin Square Park
- Glenmuir
- Tribeca

69. Upon information and belief, EMI believes that Mr. Lewis used EMI's confidential and trade secret information, including customer history, how EMI calculates its prices, and personnel information that was contained on the Laptop to solicit the employees, customers, and potential customers discussed above.

70. Upon information and belief, Yard Solutions and/or Mr. Lewis have continued to contact additional employees and customers to try to solicit them to go to Yard Solutions.

71. While Defendants have denied wrongdoing, EMI's investigation has discovered compelling circumstantial evidence that Mr. Lewis wrongfully retained and shared EMI's trade secrets and confidential information with Yard Solutions while working as an officer of Yard Solutions and that either Mr. Lewis or someone else at Yard Solutions used EMI's trade secrets and confidential information to further Yard Solutions' business interests.

72. Furthermore, Mr. Lewis' story has repeatedly changed in the face of new evidence. First, Mr. Lewis denied having the Laptop. His story then changed when EMI investigated and determined the Laptop was being used and was logged into Mr. Lewis's login at Yard Solutions, so he provided the Laptop to his wife who returned it. Then Mr. Lewis denied he had accessed the Laptop. When Vestige's investigation demonstrated that the Laptop had been used repeatedly

during the time that Mr. Lewis claimed he had not used it and the Laptop was connected to Yard Solutions's wireless network approximately 62 times, Mr. Lewis then claimed that he only used the Laptop to work on a landscaping software program to create projects or proposals for customers. For these reasons, EMI cannot accept any of Mr. Lewis' statements at face value.

73. As noted previously, on at least two occasions, EMI's counsel requested the USB devices that were connected to the Laptop, so that Vestige could determine whether any of the EMI's trade secrets and confidential information had been copied off the Laptop. Despite these requests, the USB devices have not been provided. At this time, it appears that Mr. Lewis and Yard Solutions contend that some or all of the information on those USB devices is their proprietary information.

74. In sum, EMI cannot complete its investigation until it has the USB devices. EMI's trade secrets and confidential information were retained within the Laptop kept by Mr. Lewis (including EMI's master customer lists for several years, information regarding how EMI determines its prices that could be used to bid a lower price than EMI, employee salary information, and renewal paperwork for at least one customer). Without reviewing those USB devices, EMI cannot determine if those trade secrets and confidential information were copied onto other devices before the Laptop was returned to EMI. In addition to the forensic investigation, EMI has been told by a former Yard Solutions employee that multiple EMI documents have been saved on the Yard Solutions network (and that some of those documents still have EMI"s logo on them). EMI has lost 5 employees to Yard Solutions since the time that Mr. Lewis left, and Yard Solutions has provided services to EMI's customers and potential customers since the time that Mr. Lewis left. On this record, EMI has no choice but to file this lawsuit to secure this Court's assistance in its investigation and protect its trade secrets and confidential information that were contained on the Laptop that Mr. Lewis retained.

## Count I: Misappropriation of Trade Secrets under the
## Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*
## (against both Defendants)

75. Plaintiff incorporates the allegations of the foregoing paragraphs, as if fully restated here.

76. During his employment with EMI, Mr. Lewis had access to and was provided Plaintiff's trade secrets and confidential information, including sales information and employee information. In addition, the Laptop included copies of these and other trade secrets, including but not limited to, EMI's 2021 Customer List, EMI's 2020 Master Customer List, EMI's 2019 Master Customer List, The Charles at Riggins Run 2021 Full Service Renewal, Maintenance/Snow Removal price estimators, and employee records that included names, addresses, phone numbers, social security numbers, and health records.

77. Mr. Lewis knew that he was under a duty to maintain the secrecy and confidentiality of EMI's information, which duty continued after his employment terminated.

78. The trade secrets and confidential information that are contained on the Laptop and/or that Mr. Lewis accessed are protected and confidential.

79. The trade secrets and confidential information accessible and/or downloaded from EMI's computer are not known to the public and they derive independent economic value from not being known by persons who can obtain economic value from their use.

80. EMI takes reasonable efforts to maintain secrecy of its confidential and proprietary trade secret information, including its master customer lists, its contracts with customers, how it calculates its prices, and employee salary information.

81. The trade secrets and confidential information described in this Complaint, constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

82. The trade secrets and confidential information downloaded or accessed by Mr.

14

Lewis, as referenced in this Complaint, are key components of products and services that are used in, and intended for use in, interstate commerce, within the meaning of 18 U.S.C. § 1836(b)(1).

83. Without justification or privilege to do so, Mr. Lewis has misappropriated EMI's trade secrets and confidential information by taking and retaining that information, including the customer information and personnel information described above, as well as copying the data or allowing another person to copy the data and upload that information to Yard Solution's computers, systems, or servers.

84. Upon information and belief, Mr. Lewis intends to commit further misappropriation by sharing all or parts of the trade secrets and confidential information with his new employer, Yard Solutions, which is a direct competitor of EMI.

85. Upon information and belief, after Mr. Lewis' employment terminated with EMI, he has disclosed or discussed confidential and trade secret information of EMI to Yard Solutions in violation of his obligations to EMI.

86. Upon information and belief, Defendants have used EMI's confidential and trade secret information in soliciting EMI's former employees and customers.

87. Upon information and belief, Yard Solutions knew or had reason to know that Mr. Lewis had acquired Plaintiff's trade secret information by improper means and may have even encouraged Mr. Lewis to disclose the trade secret information.

88. Yard Solutions, through industry practice, was aware that the trade secrets described herein were trade secrets.

89. Despite this knowledge, by engaging in the conduct described above, Yard Solutions misappropriated, misused, and/or otherwise improperly disclosed EMI's trade secrets and confidential information.

90. Because of these actions, EMI has suffered and will continue to suffer irreparable, substantial, and immediate harm from Defendants' retention and use of EMI's trade secrets and confidential information.

91. Defendants' misappropriation of EMI trade secrets and confidential information entitles EMI to preliminary and permanent injunctive relief, enjoining Defendants from engaging in unfair competition against EMI by using, disclosing or sharing EMI's trade secrets and confidential information.

92. As a direct and proximate result of Defendants' actions, EMI faces the immediate and irreparable loss of its trade secrets and confidential information, the loss of its competitive position, the loss of business goodwill, the loss of sales, and the loss of its financial investment in its customers and employees.

93. Any potential injury that may be suffered by Defendants if injunctive relief is granted will certainly not outweigh the substantial injury that will be suffered by EMI if injunctive relief is not granted.

94. The public interest will be served by the granting of injunctive relief.

95. EMI is likely to succeed on the merits of its claim.

96. Further, Defendants should be found liable for additional monetary compensatory damages for the harm inflicted during the period of misappropriation, as well as punitive damages to punish and disincentivize the conduct giving rise to these claims.

**Count II: Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*** 
**(against both Defendants)**

97. Plaintiff incorporates the allegations of the foregoing Paragraphs, as if fully restated here.

98. Mr. Lewis has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030,

by intentionally accessing EMI's Laptop, which is used for interstate commerce or communication, without authorization and by exceeding authorized access to such Laptop and by retaining and transferring information from such protected Laptop, and so causing significant damage.

99. Mr. Lewis has violated the Computer Fraud and Abuse Act, 18 U.S.C. §1030 by knowingly, and with intent to defraud EMI through his wrongful actions, accessing EMI's Laptop, which qualifies as a protected computer under that statute, without authorization or by exceeding authorized access to such computer, and by means of such conduct, furthering his intended fraud.

100. While Mr. Lewis denies accessing EMI's network, the Laptop contains extensive trade secrets and confidential information from EMI, that it was used repeatedly since Mr. Lewis' employment with EMI ceased and his consultancy with Tusker Arms ended, that the Laptop was used while accessing the Yard Solutions network on over 62 occasions, and that the Laptop was in Mr. Lewis' possession until his wife returned the Laptop.

101. As a result, upon information and belief, Mr. Lewis accessed EMI's protected computer, the Laptop, after his employment with Plaintiff had ended and after his authorization to access EMI's computer had been revoked to obtain information from EMI's protected computer. As such, Mr. Lewis obtained and misappropriated significant and critical trade secrets and confidential information relating to EMI's current and prospective customers, services, pricing information, employees, and more.

102. The EMI Laptop that Mr. Lewis accessed, as described above, qualifies as a "protected computer" within the meaning of the Computer Fraud and Abuse Act.

103. EMI's policies and protocols state that e-mail and internet are to be used to assist employees in the performance of their jobs and for official Company business. Thus, EMI's

computer and its contents are EMI property.

104. Mr. Lewis was prohibited from accessing any EMI trade secrets and confidential information after his employment ended and was required to return all original and copies of EMI information intact and immediately after his employment ended.

105. It is undisputed that Mr. Lewis did not return all of EMI's trade secrets and confidential information when his employment ceased and, instead, retained the Laptop that included it.

106. Mr. Lewis violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing EMI's computer, beyond the scope of the authorization granted, causing damage to EMI, recklessly or without due regard for his actions.

107. Mr. Lewis' aforementioned conduct caused loss and damage to EMI during any one-year period aggregating at least $5,000, including but not limited to the costs associated with its investigation of the Laptop and the losses associated with the misappropriation of EMI's trade secrets and confidential information.

108. Mr. Lewis has engaged in this conduct as a management-level employee of Yard Solutions, which means that his actions are imputed to Yard Solutions. Additionally, Yard Solutions has endorsed Mr. Lewis' conduct by failing to exercise any meaningful oversight over and by benefiting directly from his actions. Finally, to the extent that any other Yard Solutions' employee accessed the Laptop, that Yard Solutions employee did not have EMI's authorization or permission to access that computer.

109. These actions taken by Mr. Lewis and Yard Solutions are direct violations of the Computer Fraud and Abuse Act—at a minimum, 18 U.S.C. §§ 1030(a)(2), 1030(a)(4), 1030(a)(5), and have harmed EMI, including, without limitation, harm to EMI's trade secrets and confidential information, including data, metadata, programs, systems, and other information, and

impairment of the integrity and availability of data, metadata, programs, systems, and other information.

110. EMI has also suffered damage and loss through the cost of responding to the offenses and from losing customers and employees as a result of Mr. Lewis and Yard Solutions' actions.

111. Mr. Lewis and Yard Solutions' actions also entitle EMI to injunctive relief pursuant to 18 U.S.C. § 1030(g), since they have caused and will continue to cause EMI irreparable injury.

112. Damages, alone, are not adequate to compensate EMI for these actual and threatened injuries.

113. EMI also seeks all other remedies available to it under the law, including actual and consequential damages, attorneys' fees, costs, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment against Defendants as follows:

a) That the Court grant a preliminary and permanent injunction in favor of Plaintiff requiring Defendants to return all confidential information and trade secret information in their possession and prohibiting use or disclosure of Plaintiff's confidential information and trade secret information;

b) That the Court grant a preliminary and permanent injunction in favor of Plaintiff restraining Defendants from soliciting and/or contacting any customers or employees of Plaintiff using Plaintiff's confidential information and trade secret information;

c) Compensatory damages in an amount exceeding $200,000 and punitive damages in excess of $100,000.

d) That the Court award Plaintiff their attorney's fees and costs; and,

e) That the Court grant such additional relief as it may deem just and proper.

Respectfully submitted,

/s/ John F. Marsh
John F. Marsh, Trial Attorney (0065345)
Jolene S. Griffith (0084940)
Bailey Cavalieri LLC
One Columbus
10 West Broad Street, Suite 2100
Columbus, Ohio 43215-3422
Facsimile No. (614) 221-0479
Phone: (614) 229-3230
Email: jmarsh@baileycav.com
jgriffith@baileycav.com

*Attorneys for Plaintiff Environmental Management, Inc.*

## JURY DEMAND

Plaintiff Environmental Management, Inc. demands a jury for all claims that can be so tried.

/s/ John F. Marsh
John F. Marsh (0065345)